RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0175p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CENTRAL OHIO COAL COMPANY,

*Petitioner,*

*v.*

No. 13-3712

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS; LARRY T. STERLING,

*Respondents.*

On Petition for Review of an Order of the Benefits Review Board.
No. 12-0285-BLA

Argued: June 19, 2014

Decided and Filed: August 7, 2014

Before: SILER, CLAY, and GIBBONS, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** William S. Mattingly, JACKSON KELLY PLLC, Morgantown, West Virginia, for Petitioner. Sean G. Bajkowski, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent. Heath M. Long, PAWLOWSKI, BILONICK & LONG, Edensburg, Pennsylvania, for Respondent Sterling. **ON BRIEF:** William S. Mattingly, JACKSON KELLY PLLC, Morgantown, West Virginia, for Petitioner. Sean G. Bajkowski, Helen H. Cox, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent. Heath M. Long, PAWLOWSKI, BILONICK & LONG, Edensburg, Pennsylvania, for Respondent Sterling.

1

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  Larry Sterling, a former coal miner for Central Ohio Coal Company, received a favorable decision from an administrative law judge (ALJ) declaring him eligible for benefits under the Black Lung Benefits Act.  The Department of Labor's Benefits Review Board affirmed the decision on appeal.  Central Ohio now petitions this court to review the award.  It contends that the ALJ wrongly applied the statutory presumption of pneumoconiosis and improperly discredited certain medical opinions disputing Sterling's pneumoconiosis diagnosis, and further argues that the ALJ failed to explain his resolution of conflicting evidence about the extent of Sterling's past cigarette smoking.  The petition is denied.

**I.**

The Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.*, provides for the payment of black-lung benefits through the United States Department of Labor (DOL) to coal miners who are totally disabled due to pneumoconiosis, a "chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b).  Pneumoconiosis comes in two forms: clinical pneumoconiosis and legal pneumoconiosis.  "Clinical pneumoconiosis" refers to certain lung diseases that the medical community recognizes to be caused by exposure to coal dust—in the words of the applicable regulation, diseases "characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment." 20 C.F.R. § 718.201(a)(1).  "Legal pneumoconiosis" is a broader and less definite term that refers to any chronic lung disease that was caused *in this instance* by exposure to coal dust.  20 C.F.R. § 718.201(a)(2).

To establish entitlement to benefits, the claimant must prove by a preponderance of the evidence that (1) he has pneumoconiosis, (2) his pneumoconiosis arose in whole or in part out of his coal mine employment, (3) he is totally disabled, and (4) the total disability is due to pneumoconiosis. *Greene v. King James Coal Mining, Inc.*, 575 F.3d 628, 634 (6th Cir. 2009)

(citing 20 C.F.R. §§ 718.202–04).  The pneumoconiosis is deemed to "aris[e] out of coal mine employment" if it is "significantly related to" or was "substantially aggravated by" dust exposure during the claimant's coal mine employment.  20 C.F.R. § 718.201(b).  A benefits claimant can establish the existence of pneumoconiosis with medical evidence such as a chest X-ray, autopsy or biopsy evidence, or reasoned medical opinions, or by invoking an applicable presumption.  20 C.F.R. § 718.202(a).

One such statutory presumption provides that a claimant may establish a rebuttable presumption of pneumoconiosis if the claimant has a totally disabling respiratory or pulmonary impairment and spent at least fifteen years working in an underground coal mine or "in coal mines other than underground mines in conditions substantially similar to those in underground mines."  20 C.F.R. § 718.305(b)(1) (implementing 30 U.S.C. § 921(c)(4)).  In September 2013 the DOL promulgated regulations further explicating this presumption:  "The conditions in a mine other than an underground mine will be considered 'substantially similar' to those in an underground mine if the claimant demonstrates that the miner was regularly exposed to coal-mine dust while working there."  20 C.F.R. § 718.305(b)(2).  Once the presumption is invoked, the burden of persuasion shifts to the employer to establish that (1) the miner has neither clinical nor legal pneumoconiosis, or (2) the miner's respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine.  30 U.S.C. § 921(c)(4); *Morrison v. Tenn. Consol. Coal Co.*, 644 F.3d 473, 479 (6th Cir. 2011).

## II.

Sterling was born in 1945 and spent at least twenty-three years in the coal industry. Sterling never worked below ground, but he worked the gamut of aboveground jobs: strip mining and augering, loading coal trucks, driving those trucks, and doing general maintenance.  He spent most of his time operating a bulldozer, removing the dirt and rock that covered a coal seam and then replacing that material, called overburden, when mining was complete.

Sterling stopped mining in 1999, when the Central Ohio Coal Company laid him off. Sometime thereafter he was asked to return to work at the mine, but he was unable to pass the requisite physical examination due to the poor condition of his lungs.  Evidently the coal company worried that he "could pass out and hurt [him]self or someone else."  Sterling has been

using an oxygen tank since 1995, when Dr. Thomas Forrestal, Jr., his family doctor, instructed him to start using it.  At some point Dr. Forrestal told Sterling to see Dr. Philip Diaz, who ran the Lung Center at Ohio State University.  Dr. Diaz diagnosed Sterling with chronic obstructive pulmonary disease (COPD) caused by a combination of coal dust and cigarette smoke.

In October 2006 Sterling filed a claim for benefits under Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1977 and the Patient Protection and Affordable Care Act of 2010.  His claim was denied by the District Director of the Division of Coal Mine Workers' Compensation within the U.S. Department of Labor's Office of Workers' Compensation Programs.  After Sterling requested a formal hearing, an ALJ held a hearing in June 2011 to assess the merits of Sterling's claim.

The ALJ first attempted to determine the full extent of Sterling's history as a cigarette smoker.  Sterling testified that he was a heavy smoker for almost forty years—from Thanksgiving of 1966 until he quit on Valentine's Day of 2005.  For the first ten or fifteen years, Sterling testified, he smoked about one pack a day.  Then he began to smoke closer to two packs a day; on especially busy workdays, he would smoke upwards of three packs a day.  The ALJ also considered prior statements that Sterling had made to various doctors about his smoking history.  Noting that the evidence of Sterling's smoking history was "somewhat contradictory," the ALJ concluded that Sterling had averaged about one-and-a-half packs of cigarettes per day for thirty-eight years—a total of fifty-seven pack-years of cigarettes.

The ALJ then determined that Sterling was entitled to a statutory presumption of pneumoconiosis because he had spent more than fifteen years working in aboveground coal mines whose conditions were substantially similar to the conditions in underground mines.  The ALJ credited Sterling's testimony that the conditions throughout his employment at the coal mine were "very dusty."  In the ALJ's view, Sterling's testimony "establishes that while [Sterling] was working in surface mine employment he was exposed to a heavy amount of dust to include coal dust"—especially on hot and dry days, when trucks would kick up a great deal of dust as they drove along the haul roads.  Although Sterling usually operated bulldozers equipped with covered cabs, the seals in those cabs often leaked, and Sterling spent much of the day working outside the cab in the open, dusty air.  As a result, at the end of each day Sterling's

clothes would be soiled with dirt, grease, and oil. Sterling's "description of his clothes when he returned home from work is typical testimony by underground coal miners, who similarly complain about being exposed to dust while in the mines and having significant dust on their clothes when they return home from work." That entitled Sterling to the statutory presumption.

The ALJ next concluded that Central Ohio failed to rebut the presumption through proof that Sterling has neither clinical nor legal pneumoconiosis. He deemed the X-ray evidence inconclusive on the whole because various radiologists had reached contradictory views about the presence of pneumoconiosis after reviewing three separate X-rays. The ALJ also considered medical opinions prepared by five different doctors. Two doctors diagnosed Sterling with clinical pneumoconiosis, while the three others opined that Sterling's lung disease was not due to clinical pneumoconiosis. Yet the ALJ credited none of those five opinions due to various methodological flaws, and the ALJ therefore determined that the presumption of clinical pneumoconiosis withstood scrutiny.

On the issue of legal pneumoconiosis, three doctors concluded that Sterling did not have legal pneumoconiosis, but the ALJ discredited those opinions due to either internal inconsistencies or incompatibility with applicable DOL regulations. The other two opinions—those provided by Drs. Diaz and Forrestal—both diagnosed Sterling with legal pneumoconiosis, and the ALJ afforded those opinions full probative weight. The ALJ thus held that the presumption of legal pneumoconiosis survived examination *and* that Sterling had established legal pneumoconiosis by a preponderance of the evidence, even without application of the statutory presumption.

Central Ohio appealed the ALJ's decision to the DOL's Benefits Review Board, making the same three objections that the company now raises in this court. When the Board upheld the ALJ's decision, Central Ohio timely appealed the Board's decision to the United States Court of Appeals for the Fourth Circuit. Counsel for Central Ohio was informed that he had filed the appeal in the wrong court, and Central Ohio filed a motion to transfer venue to this court. The Fourth Circuit granted the motion in June 2013.

### III.

In black-lung-benefits cases, we review the Board's legal conclusions *de novo* and review the ALJ's decision (not the Board's) to determine whether it was supported by substantial evidence. *Greene v. King James Coal Mining, Inc.*, 575 F.3d 628, 633 (6th Cir. 2009). "The ALJ's findings are conclusive if they are supported by substantial evidence and accord with the applicable law." *Id.* (citing *Tenn. Consol. Coal Co. v. Kirk*, 264 F.3d 602, 606 (6th Cir. 2001)). "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Kolesar v. Youghiogheny & Ohio Coal Co.*, 760 F.2d 728, 729 (6th Cir. 1985) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In deciding whether the substantial evidence standard is satisfied, we consider whether the ALJ adequately explained the reasons for crediting certain testimony and documentary evidence over other testimony and documentary evidence." *Greene*, 575 F.3d at 634. "Where the substantial evidence requirement is satisfied, the court may not set aside the ALJ's findings, 'even if [the court] would have taken a different view of the evidence were we the trier of facts.'" *Id.* (alteration in original) (quoting *Ramey v. Kentland Elkhorn Coal Corp.*, 755 F.2d 485, 486 (6th Cir. 1985)).

### IV.

Central Ohio raises three points of error in this appeal. It contends that the ALJ wrongly applied the statutory presumption of pneumoconiosis, improperly discredited certain medical opinions disputing Sterling's pneumoconiosis diagnosis, and failed to explain his resolution of conflicting evidence about the extent of Sterling's past cigarette smoking. We take each in turn.

### A.

According to Central Ohio, the ALJ made two errors in applying the rebuttable presumption of pneumoconiosis.[1] The company first argues that the ALJ's application of the

---

[1]Application of the statutory presumption was not necessary for the ALJ's decision, as the ALJ concluded that Sterling established legal pneumoconiosis by a preponderance of the evidence. But neither Sterling nor the DOL urges us to decide this appeal without determining whether the ALJ properly applied the presumption. We therefore consider the propriety of the presumption in this case even though the presumption was not necessary for the ALJ's decision.

statutory presumption was deficient because the ALJ failed to explain how the conditions of Sterling's employment were substantially similar to the conditions prevalent in underground mines. In Central Ohio's view the comparison of the conditions in two separate places requires the ALJ to explain what conditions are prevalent in each of those places before comparing them. Because the ALJ never explained the conditions in underground mines, Central Ohio argues that the ALJ's decision is effectively insulated from appellate review.

Whatever facial appeal this argument might have, it is inconsistent with a DOL regulation providing that "[t]he conditions in a mine other than an underground mine will be considered 'substantially similar' to those in an underground mine if the claimant demonstrates that the miner was regularly exposed to coal-mine dust while working there." 20 C.F.R. § 718.305(b)(2).[2] The DOL did not promulgate that regulation until September 2013—more than eighteen months after the ALJ issued the decision in this case. *See* Regulations Implementing the Byrd Amendments to the Black Lung Benefits Act (Final Rule), 78 Fed. Reg. 59102, 59104–05 (Sept. 25, 2013). But a new interpretive regulation that "is substantively consistent with prior regulations or prior agency practices, and has been accepted by all Courts of Appeals to consider the issue," can be applied to cases pending at the time the regulation is promulgated. *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 860 (D.C. Cir. 2002).

The 2013 regulation reflects the DOL's longstanding interpretation of the statutory presumption. *See* Regulations Implementing the Byrd Amendments to the Black Lung Benefits Act (Notice of Proposed Rulemaking), 77 Fed. Reg. 19456, 19461 (Mar. 30, 2012) ("The proposed standard reflects the Director's longstanding interpretation of the 'substantially similar' language [in the statute] . . . ."). It also reflects an interpretation of the regulation that has been accepted by both of the courts of appeals that have considered the issue. *See Antelope Coal Co./Rio Tinto Energy Am. v. Goodin*, 743 F.3d 1331, 1342 (10th Cir. 2014); *Freeman United Coal Mining Co. v. Summers*, 272 F.3d 473, 479–80 (7th Cir. 2001) (citing *Dir. of Office of Workers' Comp. Programs v. Midland Coal Co.*, 855 F.2d 509, 512 (7th Cir. 1988)). The September 2013 regulation therefore applies to Sterling's claim, and accordingly the ALJ did not

---

[2]At oral argument Central Ohio waived any challenge to the validity (though not the applicability) of the DOL regulation.

err by failing to discuss the conditions that are prevalent in underground mines. *See Antelope Coal Co.*, 743 F.3d at 1342 (applying this same regulation to a case that was pending at the time the DOL promulgated the regulation). Sterling needed only to establish that he "was regularly exposed to coal-mine dust while working" at the mine. 20 C.F.R. § 718.305(b)(2).

Central Ohio maintains that Sterling failed to meet this burden because having dirty clothes at the end of a shift is not equivalent to inhaling dust all day. But this argument misses the point of the ALJ's analysis. The ALJ did not apply the presumption because Sterling's clothes were covered in dirt at the end of each workday; the judge applied the presumption because Sterling testified that the conditions at the mine were "very dusty," and this testimony was corroborated by other testimony about the heavy truck traffic at the mine and the amount of dust that covered Sterling's clothes at the end of his shifts.

At oral argument Central Ohio maintained that the ALJ's decision must be vacated and remanded because the ALJ failed to differentiate between coal dust and dust from dirt. The statutory presumption applies only if "the miner was regularly exposed to *coal-mine dust* while working" at the aboveground mine, 20 C.F.R. § 718.305(b)(2) (emphasis added), and the distinction therefore may be significant. Yet Central Ohio did not raise this issue in its briefs, and accordingly it has forfeited the argument. *See Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 525 n.4 (6th Cir. 2006). And in all events, Central Ohio's argument lacks merit because the ALJ found that Sterling "was exposed to a heavy amount of dust *to include coal dust*."

Central Ohio also focuses on testimony by Dr. Paul Knight, who said (based on what Sterling previously had told him about the conditions at the mine) that "it was hard to say" whether the conditions at the aboveground mine where Sterling worked were substantially similar to the conditions prevalent in underground mines. But the statute places the responsibility for making the substantial-similarity finding in the hands of the ALJ, not the claimant's examining doctors. The ALJ was not required to dispel with the presumption simply because a doctor was not sure whether the presumption should be applied.

This court's review of the ALJ's factual conclusion is limited to determining whether it was supported by substantial evidence, and that standard is satisfied here.

**B.**

Because the ALJ properly applied the statutory presumption, Central Ohio bore the burden to prove that Sterling suffered from neither clinical nor legal pneumoconiosis. With respect to legal pneumoconiosis, Central Ohio concedes that Sterling is totally disabled due to COPD. The sole question before this court is whether Sterling's COPD was "significantly related to" or "substantially aggravated by" coal-dust exposure during Sterling's employment at the mine. 20 C.F.R. § 718.201(b).

Central Ohio argues that the ALJ improperly discredited the opinions of Drs. David Rosenberg and Herbert Grodner, which, if properly considered, would have established that Sterling's COPD was not attributable to coal-dust exposure. Dr. Rosenberg concluded that Sterling's COPD was not attributable to coal-dust exposure because Sterling's COPD was "characterized by a severe reduction of his $FEV_1$ and $FEV_1/FVC$ ratio," while "the $FEV_1/FVC$ ratio is generally preserved" when an individual's COPD is caused by coal-dust exposure. Dr. Rosenberg stated that a marked decrement in the $FEV_1/FVC$ ratio[3] is attributable to a smoking-related form of COPD rather than COPD caused by coal-dust exposure.

The ALJ appropriately declined to credit Dr. Rosenberg's medical opinion because it was inconsistent with the DOL's position that "coal mine dust exposure may cause COPD, with associated decrements in $FEV_1/FVC$." *See* Joint Appendix at 67 (citing Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. 79920, 79943 (Dec. 20, 2000)). Dr. Rosenberg's medical opinion discusses at great length the effects of both cigarette smoking and coal-dust exposure on the $FEV_1/FVC$ ratio. He explains that both DOL and the Global Initiative for Chronic Obstructive Lung Disease overbroadly define COPD as a reduction in the $FEV_1/FVC$ ratio, whereas "recent literature (including literature published after D.O.L.'s revisions to the black lung regulations) establishes the limitation of defining COPD as simply a reduction in $FEV_1$ or $FEV_1\%$ values." In short, Dr. Rosenberg suggests that, contrary to DOL's purportedly oversimplistic definition, there may be

---

[3]$FEV_1$ is "forced expiratory volume in one second." FVC is "forced vital capacity." Both are pulmonary-function tests that measure the volume of air that can be blown out of the lungs after taking a full breath: FVC tests total volume, and $FEV_1$ tests how much air is emitted in one second.

forms of COPD that are not correlated with a reduced $FEV_1/FVC$ ratio, and those forms of COPD are much more likely to be associated with coal-dust exposure.

Dr. Rosenberg may be right as a matter of scientific fact, but his analysis plainly contradicts the DOL's position that COPD caused by coal-dust exposure may be associated with decrements in the $FEV_1/FVC$ ratio. The ALJ was entitled to consider the DOL's position and to discredit Dr. Rosenberg's testimony because it was inconsistent with the DOL position set forth in the preamble to the applicable regulation. *See A&E Coal Co. v. Adams*, 694 F.3d 798, 801–02 (6th Cir. 2012) (stating that although ALJs need not look at the regulation's preamble to assess doctors' credibility, they are entitled to do so). Central Ohio does not challenge the substance of the DOL's position as articulated in the regulation's preamble—that is, Central Ohio does not argue that COPD resulting from coal-dust exposure is not correlated with a reduced $FEV_1/FVC$ ratio. Were Central Ohio to make that argument, this court would need to engage the substance of that scientific dispute. *See Harman Mining Co. v. Dir. of Office of Workers' Comp. Programs*, 678 F.3d 305, 314 n.3 (4th Cir. 2012). But this court could do that only after Central Ohio submitted "the type and quality of medical evidence that would invalidate" the DOL's position in that scientific dispute. *Midland Coal Co. v. Dir. of Office of Workers' Comp. Programs*, 358 F.3d 486, 490 (7th Cir. 2004). Central Ohio has presented no such evidence, and it asks this court to make no such determination. The sole issue presented here is whether the ALJ was entitled to discredit Dr. Rosenberg's medical opinion because it was inconsistent with the DOL position set forth in the preamble, and the answer to that question is unequivocally yes. *See Harman Mining Co.*, 678 F.3d at 315 (citing *Helen Mining Co. v. Dir. of Office of Workers' Comp. Programs*, 650 F.3d 248, 256 (3d Cir. 2011); *Consolidation Coal Co. v. Dir. of Office of Workers' Comp. Programs*, 521 F.3d 723, 726 (7th Cir. 2008)).

Nor did the ALJ commit reversible error by discrediting the opinion of Dr. Grodner, who concluded that Sterling did not have legal pneumoconiosis. Dr. Grodner first concluded that Sterling did not have clinical pneumoconiosis because the X-ray evidence was negative. Dr. Grodner instead diagnosed Sterling with COPD. But when asked whether the COPD arose in whole or in part from Sterling's coal-mine employment—*i.e.*, whether Sterling had legal pneumoconiosis—Dr. Grodner answered, "Not applicable since he does not have coal workers'

pneumoconiosis." In essence, Dr. Grodner said that Sterling's COPD was not legal pneumoconiosis because he did not have clinical pneumoconiosis. The ALJ appropriately concluded that Dr. Grodner's opinion was not entitled to any weight because it conflated clinical and legal pneumoconiosis. That medical opinion conflicts with the statute, which differentiates between legal and clinical pneumoconiosis, and accordingly the ALJ was entitled to give it little or no weight. *See Harman Mining Co.*, 678 F.3d at 313.

Central Ohio next argues that the ALJ improperly credited Dr. Diaz's opinion diagnosing Sterling with legal pneumoconiosis. According to Central Ohio, Dr. Diaz's opinion should have been discredited because Dr. Diaz conceded that many of Sterling's symptoms were associated with cigarette smoking rather than coal-dust exposure. But the ALJ repeatedly acknowledged that Dr. Diaz attributed many of Sterling's symptoms to cigarette smoking. The ALJ simply credited Dr. Diaz's opinion that "both cigarette smoking and coal dust exposure contributed to [Sterling's] COPD." This court previously has held that a benefits claimant is "not required to demonstrate that coal dust was the *only* cause of his current respiratory problems"; rather, a medical opinion that cannot eliminate cigarette smoking as a cause of the claimant's COPD nevertheless must be considered evidence of legal pneumoconiosis if the opinion is "unequivocal that coal dust exposure aggravated [the claimant's] pulmonary problems." *Cornett v. Benham Coal, Inc.*, 227 F.3d 569, 576 (6th Cir. 2000). Dr. Diaz unequivocally concluded that coal-dust exposure contributed to Sterling's COPD, and the ALJ properly considered that opinion when determining that Central Ohio failed to rebut the presumption of legal pneumoconiosis.

Finally, Central Ohio disputes the ALJ's interpretation of the X-ray evidence and challenges the ALJ's decision not to credit Dr. Diaz's testimony with respect to the presence of clinical pneumoconiosis. We need not consider these arguments, both of which relate to the presumption of clinical pneumoconiosis, because substantial evidence supported the ALJ's conclusion that Central Ohio failed to rebut the presumption of legal pneumoconiosis. Coal miners are entitled to black-lung benefits if they establish either legal or clinical pneumoconiosis. Because Central Ohio failed to rebut the presumption of legal pneumoconiosis, it is irrelevant whether the ALJ erred in concluding that Central Ohio also failed to rebut the presumption of clinical pneumoconiosis.

**C.**

In its final claim, Central Ohio argues that the ALJ's calculation of Sterling's smoking history was "irrational, arbitrary, and capricious." The Board halfheartedly agreed, stating that the ALJ "did not fully explain how he resolved the conflicts in the evidence as to the extent of [Sterling's] smoking," but concluded that remand was not necessary because any error was harmless. Central Ohio now argues that the error was not harmless because Sterling provided his treating physicians with an understated smoking history, presumably to deter those doctors from attributing his COPD to cigarettes.

Central Ohio suggests that Sterling averaged three packs a day, but that misrepresents the evidence. Sterling apparently told one doctor that he smoked three packs on his heaviest days. But he never said that he averaged three packs per day for thirty-eight years, and he told other doctors that he smoked two packs per day "for most of his life." He told at least one doctor that he smoked one pack per day for ten years, then two packs per day after that. The record therefore does not substantiate Central Ohio's allegation of a three-pack-per-day smoking history. And in any event, Central Ohio has not established any reversible error. To establish that Central Ohio failed to rebut the presumption of legal pneumoconiosis, the ALJ relied in large part on the opinion of Dr. Diaz. Central Ohio does not contend that Dr. Diaz used an inaccurate smoking history when formulating his medical opinion as to the cause of Sterling's COPD, and Central Ohio thus cannot establish harmful error.

**V.**

For these reasons, the petition for review is denied.